Darion J. INGRAM, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–1272.

District of Columbia Court of Appeals.

Argued Feb. 24, 2005 *.

Decided Oct. 14, 2005.

* Jane Carol Norman filed the initial brief for appellant and argued the appeal. Subsequently, Robert S. Becker was appointed by the court to represent appellant, and he filed appellant's post-argument brief.

**258**

SCHWELB, Associate Judge:

On July 18, 2002, a jury convicted Darion J. Ingram of assault with intent to kill while armed,[1] aggravated assault while armed,[2] and several weapons offenses, all arising out of the shooting and wounding of Maurice E. McKay on the evening of November 5, 2001. On appeal, Ingram contends, *inter alia*, that the trial judge erred by refusing to admit into evidence proposed testimony regarding an oral jailhouse confession allegedly made by one Jameel Aleem to Ingram's trial counsel, Jane Carol Norman. Ingram asserted in the trial court, and maintains on appeal, that Aleem's confession was admissible as a statement against·penal interest. Because the judge's ruling excluding testimony about Aleem's out-of-court statement rested in substantial part on a legal conclusion with which we are unable to agree, and because the judge failed to include in his calculus grand jury testimony by Aleem that we consider highly relevant, we remand the case to the trial court for further proceedings consistent with this opinion.

Robert S. Becker, Washington, DC, appointed by the court, for appellant.

Rhonda L. Campbell, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Thomas R. Tourish, and Glenn S. Leon, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON,** Chief Judge, and SCHWELB and WAGNER,*** Associate Judges.

## I.

## THE TRIAL COURT PROCEEDINGS

A. *The events of November 5, 2001.*

The events which took place on the evening of the shooting were described at the trial by McKay, who was the principal witness for the prosecution, and by Ingram, who testified in his own behalf. Aleem also gave evidence about these

** Chief Judge Washington was an Associate Judge of the court at the time this case was argued. His status changed to Chief Judge on August 6, 2005.

*** Judge Wagner was Chief Judge of the court at the time this case was argued. Her status changed to Associate Judge on August 6, 2005.

1. D.C.Code §§ 22–401, –4502 (2001).

2. D.C.Code §§ 22–404.01, –4502 (2001).

events before the grand jury, but he was not a witness at the trial.[3] Based on the trial testimony of both McKay and Ingram, which was consistent with Aleem's testimony before the grand jury, it is undisputed that the three men were all friends [4] who, among other common activities, smoked marijuana together. On the evening of November 5, 2001, McKay, Ingram and Aleem, together with another friend, Alfred Montgomery, were in an alley near 46th Street, N.E., apparently smoking "weed." [5]

McKay testified that Ingram, who had been walking ahead of him, eventually "drifted behind" McKay. Initially, McKay paid no attention to Ingram's changed location, but suddenly Ingram told McKay to "look to [his] left." When McKay did so, Ingram shot McKay in the back of the head. McKay testified that he fell to the ground and that Ingram continued to shoot at him while he (McKay) was lying in the alley. One of the bullets allegedly fired by Ingram when McKay was down struck McKay in the left leg.

According to McKay, the other three men all ran from the scene. McKay was bleeding profusely, but, notwithstanding his condition, he succeeded in "jumping a fence," and he knocked on the patio door of a local resident, Ms. Gail Sivels. Ms. Sivels called 911, and after the police arrived, McKay told Officer Isaac Jackson that "Darion" had shot him.[6] McKay later identified Ingram as his assailant from a photo array, and subsequently at trial. On cross-examination, however, McKay acknowledged that he told Aleem in early

2002, while both men were detained in the District of Columbia jail, that he did not know who shot him; he testified that he regarded Aleem "as a threat to me."

Taking the stand in his own defense, Ingram denied that he had shot McKay.

According to Ingram, the four men were all smoking marijuana and drinking Remy Martin Cognac, but McKay was the most "under the influence" and was "acting weird." Ingram testified that he and Montgomery were rolling marijuana "blunts" while McKay and Aleem were together a short distance away. Suddenly, he heard a shot. Montgomery pushed him to induce him to run, and the two men did so.

Ingram testified that, at the time of the offense, he did not realize that McKay had been shot, and he claimed that he did not learn that McKay was the victim of the shooting until McKay's cousin apprised Ingram of this fact three days later. Ingram admitted, however, that he did not turn around to see what had happened, that he did not call 911 or request an ambulance, and that he did not seek any assistance. Ingram also acknowledged that following his arrest, he told Detective Roy Crawford that he did not know anything about the shooting. Further, Ingram did not disclose to Detective Crawford that he (Ingram) was in the alley at the time McKay was shot.

Aleem was a difficult and inconsistent witness before the grand jury. Like Ingram, he claimed that when he heard gun-

3. Aleem's grand jury testimony is relevant to this appeal because the trial judge referred to it in his ruling excluding Ms. Norman's proffered testimony regarding Aleem's confession to her that he (Aleem) shot McKay.

4. According to McKay, he and Ingram were "supposed to be cousins."

5. McKay claimed, however, that he was not smoking marijuana on this particular occasion.

6. McKay reported that "Darion" lived at "46th Place, Northeast." Ingram's residence was on 46th Street, N.E.

shots he "just ran." Aleem stated that he went to his car, and sat in it "for a minute." He explained that "after all that I was trying to get my missile. That's what really went down." Aleem testified that he returned to the alley, and that when he arrived there unidentified people were "telling [him] some bullshit basically" and were accusing him (Aleem) of being responsible for the shooting:

> You know, . . . it don't have nothing to do with this. . . . [W]ell it do but it don't, . . . what they said. What they said was . . . directed towards me . . . .
>
> . . .
>
> Q. You said it was related to the shooting?
>
> A. No, no. It was related to me.
>
> Q. Was it related in any way to the shooting?
>
> A. Yeah. It was.
>
> Q. . . . [W]e need to know what it was sir.
>
> A. Trying to say I was busting at them, was I busting at them.
>
> Q. Meaning [ ] that you shot at them?
>
> A. Yeah. Was I shooting at them.
>
> Q. And you weren't?
>
> A. No, I wasn't.
>
> Q. Okay. And you didn't even have a gun with you in the alley, right?
>
> A. No.
>
> Q. Okay. But those people were suggesting that you had something to do with the shooting?
>
> A. Yeah.

### B. Other evidence.

On the night of the shooting, police officers recovered from the scene shell casings and bullet fragments from a .380–caliber Remington Peters pistol. On December 18, 2001, officers executed a search warrant at the home at which Ingram and his two younger brothers, Dorel and Darryl, lived with their mother.[7] During the course of their search, the officers recovered five rounds of Remington Peters .380 pistol ammunition from a bedroom dresser drawer. Ingram acknowledged at trial that he shared the dresser drawer with his brother Dorel.

Subsequently, on February 19, 2002, Ingram's two younger brothers were involved in an automobile accident involving a stolen 1996 Crown Victoria automobile. Police searched the car and recovered a .380 automatic pistol. An expert witness for the prosecution compared the shell casings and bullets from the crime scene, the .380 pistol ammunition recovered from the dresser drawer used by Ingram, and the pistol seized from the stolen automobile. The expert testified that the shell casings matched the pistol and that the bullet fragments were fired from it.[8]

### C. Aleem's confession.

Ingram's trial began on July 15, 2002. On the morning of July 17, 2002, Ms. Norman, Ingram's trial counsel, asked to approach the bench and made the following ex parte representation to the court:

> One of the witnesses was—one of the witnesses that was in the alley, Jameel Aleem, I had interviewed four or five times and he had told me a story about some other shooters shot, and I told him that we had decided that that was not a true story. So after talking to him Sunday night, I had decided not to call him because I just—after another two hours with him, I didn't believe that story.

---

**7.** Darion Ingram admitted the officers to the house with his key.

**8.** A defense expert testified, in effect, that the ballistic evidence was inconclusive.

Last night, I saw my client, and I just called Jameel [Aleem] out just to explain to him why I wasn't going to call him, because I'd seen him so many times I just wanted to explain that to him. He broke down and he started crying and he put his head in his hands. Then he looked at me and he said, "I'm the one that wasted Mo [McKay], and my only regret is that I didn't finish it off, but it's no matter because I'm going to finish it off when I get out," [9] and he told me in detail everything he did and why he did it and, you know, a lot more detail.

I found his story compelling. . . .

Ms. Norman stated that she now wished to call Aleem as a witness, but that if Aleem invoked his privilege against self-incrimination and refused to testify, then "if he doesn't testify, I want to testify to what he told me." [10]

The trial judge responded:

You can't do that. It's not against penal interest to tell a lawyer ahead of trial that—I mean, sure, if he tells it to a police officer or a prosecutor, *but there's no jeopardy to tell you.*

(Emphasis added.) The italicized statement, in our view, was legally erroneous, but the trial judge has adhered to it throughout the course of this case.[11]

The trial judge directed Ms. Norman to apprise the government of what Aleem had told her. The prosecutor took the position that Aleem's confession was not believable,

and the judge stated that he had read Aleem's grand jury testimony and that Aleem was "lying through his teeth."

The judge appointed counsel for Aleem and, upon the advice of his attorney, Aleem invoked his Fifth Amendment privilege and declined to testify. The judge then formally ruled that Ms. Norman would not be permitted to testify regarding Aleem's confession to her, because

1. the statement proffered by Ms. Norman was not against Aleem's penal interest;

2. based on Aleem's grand jury testimony and representations made by the prosecutors regarding their dealings with him, Aleem was an unreliable witness whose account should not be received in evidence unless Aleem was subject to cross-examination by the government; and

3. more specifically, that "any statement made in the presence of Mr. Ingram and Ms. Norman [12] at the jail two nights ago does not have sufficient indicia of reliability to be allowed to come into evidence as a statement of penal interest under [*Laumer v. United States*, 409 A.2d 190 (D.C.1979) (en banc)] or the corresponding federal rule or any other rule of evidence of which I'm aware."

The judge added:

In the same breath that he says, "I'm the one who did it," he says, "And I'll

---

9. According to Ms. Norman, Aleem was in jail for criminal contempt of court but expected to be released in a few days.

10. Ms. Norman recognized that she could not both serve as counsel for Ingram and testify, but she indicated that her husband, Ferris Bond, Esquire, also a criminal defense attorney, was prepared to examine her and take over the representation.

11. The government has contended in a post-argument submission that the trial judge did not rule that statements not made to a law

enforcement officer were not against penal interest. The judge's own words, however, reveal beyond peradventure that he believed that a confession made to Ms. Norman was not against Aleem's penal interest. The judge repeated this proposition on several subsequent occasions.

12. Although the judge was apparently under the impression that Aleem's confession to Ms. Norman was made in Ingram's presence, the record does not reflect that Ingram was with Ms. Norman when she visited Aleem in jail.

say so as long *as I can't go to jail,*" and then, when he gets a chance to say so in court and is given the advice of counsel, asserts a Fifth Amendment privilege not to say so because it could put him in jail

. . . .

(Emphasis added.)

D. *The verdict and subsequent proceedings.*

On July 18, 2002, the jury convicted Ingram of all of the charges against him except two,[13] and Ingram was subsequently sentenced to serve a substantial term of imprisonment. Ingram filed a timely notice of appeal. On March 15, 2005, this court appointed new appellate counsel for Ingram[14] and remanded the record to the trial court for additional findings relating to Aleem's grand jury testimony and for any clarification of his rulings at trial that the trial judge wished to make. On April 12, 2005, the judge issued supplemental findings, which included the following summary of his reasoning:

The lack of credibility apparent from Aleem's grand jury testimony played little or no role in the court's reasoning. The prosecutors had said repeatedly that in their extensive dealings with Mr. Aleem at the grand jury and leading up to trial, they had found him so untrustworthy in providing his various versions of the events that the prosecutors decided they could *not* use him as a witness. Having given so many different versions of the events, Mr. Aleem was certainly not someone whose "testimony" could be presented to the jury through the lips of the defendant's attorney without giving

the government an opportunity to cross-examine the declarant. More importantly, under the test of *Laumer v. United States,* 409 A.2d 190 (D.C.1979) (en banc), the court concluded that the circumstances under which the statement was made, including the timing, the person making the statement and the person to whom it was made, and the lack of any corroboration, rendered the statement insufficiently trustworthy to be admissible without cross-examination. In short, Aleem's willingness to confess to the crime in front of the defendant and his lawyer *but refusal to repeat his confession to the jury or to any law enforcement officer when it might actually be against his penal interest,* did not pass the *Laumer* test for admissibility.

(Emphasis added.) The judge also concluded that nothing in Aleem's grand jury testimony could have been of any use to defense counsel:

Regardless of how one might assess the credibility of Mr. Aleem's grand jury testimony, the transcript would have been of little use to defense counsel in making the argument for the admissibility of his "jailhouse confession" as a statement against penal interest. Aleem's grand jury testimony was completely inconsistent with his statement to counsel at the jail. At best, counsel would have had to argue that "yes, he was lying at the grand jury, but he told the truth when he confessed to me at the jail."

After the judge made his supplemental findings, Ingram's new counsel and the

---

**13.** Ingram was acquitted of mayhem while armed and possession of a firearm during the commission of mayhem while armed.

**14.** The court was concerned that, as a potential witness in future proceedings, Ms. Norman could not properly continue to represent

Ingram. *See* Rule 3.7 of the District of Columbia Rules of Professional Conduct. Ms. Norman recognized that she could not both represent Ingram and testify on his behalf, and there is no indication whatever of unethical conduct on Ms. Norman's part.

government filed post-argument submissions based on the supplemental record.

## II.

## LEGAL ANALYSIS

A. *Standard of review.*

■ "The trial court's conclusion that a statement is [or is not] against the declarant's penal interest is clearly a legal question." *Laumer,* 409 A.2d at 203. Accordingly, we review *de novo* the judge's ruling that Aleem's confession to Ingram's trial counsel (as distinguished from a confession to a law enforcement officer) was not against Aleem's penal interest. *See, e.g., West v. United States,* 710 A.2d 866, 868 (D.C.1998) ("[t]he judge's legal conclusions . . . are reviewed *de novo*").

■ The trial judge's determination that a declarant's admission of guilt is (or is not) sufficiently trustworthy to warrant its admission as a statement against penal interest is reviewed in this jurisdiction under the "clearly erroneous" standard. *Laumer,* 409 A.2d at 203.[15] We have recognized, however, that "[f]indings of fact which result from a misapprehension of the applicable law . . . lose the insulation of the 'clearly erroneous' rule." *In re Application of L.L.,* 653 A.2d 873, 880 (D.C.1995) (citations omitted). To the extent that, in this particular context, the "clearly erroneous" standard is difficult to differentiate from an inquiry into whether the trial judge abused his discretion in excluding the evidence,[16] "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." *Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979); *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) (quoting *Johnson*).

B. *Applicable general legal principles.*

"[A] statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting." *Laumer,* 409 A.2d at 196 (quoting 5 Wigmore, Evidence § 1457, at 262–63 (3d ed. 1940)). Nevertheless, although most American courts have long admitted statements against pecuniary or proprietary interest, *Laumer,* 409 A.2d at 194, they traditionally excluded declarations against penal interest, largely on the basis of the decision of the House of Lords in the *Sussex Peerage Case,* 8 Eng. Rep. 1034 (H.L. 1844).[17] The primary rationale for excluding declarations against penal interest was that "to admit such statements would encourage criminal defendants to introduce perjured testimony." *Laumer,* 409 A.2d at 195. But as we noted in *Laumer,* "the possibility of perjury and fabrication is present in all cases, and the proposition that criminal defendants will be encouraged to seek false testimony is a good argument against admitting any wit-

---

**15.** As we explicitly recognized in *Laumer,* some courts review such trial court determinations for abuse of discretion. *Id.* (citations omitted).

**16.** In its "Response to Appellant's Supplemental Memorandum of Law," the government states:

We agree with appellant that the "only issue" properly before the [c]ourt is whether the trial court abused its discretion in excluding evidence of Jameel Aleem's "jailhouse confession" to defense counsel as unreliable and uncorroborated hearsay.

**17.** Citing Wigmore § 1476, at 283 and McCormick, Law of Evidence § 278, at 673 (2d ed. 1972), we observed in *Laumer* that the *Sussex Peerage* decision was contrary to earlier English precedent. 409 A.2d at 195.

nesses at all." *Id.* at 196 (quoting WIG-MORE § 1477, at 289) (internal quotation marks omitted). "[A]ny rule which hampers an honest man in exonerating himself is a bad rule, even if it also hampers a villain in falsely passing for an innocent." 2 JOHN W. STRONG, McCORMICK ON EVIDENCE § 318, at 321 (5th ed. 1999) (quoting 5 WIGMORE, EVIDENCE § 1477, at 359 (Chadbourne rev. ed. 1974)).[18]

In *Laumer,* this court, sitting en banc, declined to follow the *Sussex Perrage* decision. We held, instead, that

a statement tending to expose the declarant to criminal liability and offered as tending to exculpate the accused is admissible when the declarant is unavailable *and* corroborating circumstances clearly indicate the trustworthiness of the statement. In other words,

we adopt the test contained in FED. R. EVID. 804(b) (3).

409 A.2d at 199 (emphasis in original).[19]

Rule 804(b)(3) requires "a three-step inquiry to ascertain (1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Laumer,* 409 A.2d at 199; *see also Doret v. United States,* 765 A.2d 47, 64 (D.C.2000). In the present case, it is undisputed that Aleem made a statement (although the judge held that the statement was not against Aleem's interest because it was made to Ingram's attorney and not to a law enforcement officer). It is likewise undisputed that Aleem was unavailable, for he invoked his constitutional privilege against self-incrimination and re-

18. In a dissenting opinion which we quoted with approval in *Laumer,* 409 A.2d at 197, Justice Oliver Wendell Holmes demonstrated the unreasonableness of excluding all statements against penal interest:

The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick. The rules of evidence in the main are based on experience, logic and common sense, less hampered by *history than some parts of the substantive law.* There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; *no other statement is so much against interest as a confession of murder,* it is far more calculated to convince than dying declarations, which would be let in to hang a man[,] *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; and

when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 WIGMORE, Ev. §§ 1476, 1477.

*Donnelly v. United States,* 228 U.S. 243, 277–78, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (Holmes, J., dissenting).

19. Rule 804(b)(3) provides:

Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

fused to testify.[20] The disputed issues are whether Aleem's statement to Ms. Norman was against his penal interest, whether it was adequately corroborated, and whether any corroborating circumstances clearly indicate the trustworthiness of the statement. We address each of these questions in turn.

### C. *Penal interest.*

■ The trial judge immediately ruled, and reiterated on several occasions, that because Aleem confessed to Ingram's attorney and not to a police officer, he was not in peril of prosecution, and his statement therefore was not against his penal interest. We do not agree.

Ms. Norman was Ingram's attorney, not Aleem's. The conversation between them was not privileged. Thus, if the prosecutors had credited Aleem's confession, they could have called Ms. Norman as a witness to testify against Aleem. A confession to her was therefore at least as incriminating as one made to a law enforcement officer, and indisputably subjected Aleem to potential criminal prosecution and conviction.

It is true that if Aleem had made the confession in open court and under oath, its incriminating effect might well have been even stronger. But as we recognized in *Laumer*, 409 A.2d at 197, "[i]t is a fundamental doctrine of substantive criminal law that the confessions and the admissions of a criminal defendant, assuming that they are voluntary, are admissible in evidence." There was no indication in Ms. Norman's proffer that Aleem's statement to her was involuntary, and the admissibility of a voluntary confession (or, by analogy, of a statement against penal interest, which is really a confession or admission by a non-party) does not turn on whether or not the person to whom it was made was a law enforcement officer. Indeed, a statement against penal interest may be made to a friend or relative, or to some other individual, and still be against the declarant's penal interest. *Id.* at 201. *See, e.g., United States v. Lopez,* 777 F.2d 543, 551–53 (10th Cir.1985) (inculpatory statement made to codefendant's attorney was declaration against penal interest and erroneously excluded); *United States v. Mock,* 640 F.2d 629, 631 (5th Cir.1981) (declarant's statements to former wife held to be declaration against penal interest).

Even if we were to assume—and there is no basis for such an assumption—that Aleem did not know that Ms. Norman could testify against him regarding his confession to her, this would not be dispositive. In *United States v. Atkins,* 558 F.2d 133, 134 (3d Cir.1977), a young woman overheard a person other than the defendant admit, on the day of a bank robbery, that he (the declarant) had committed the robbery and had shot a guard. The trial judge excluded the statement, apparently because he did not believe the witness (who claimed to have overheard the declarant). The Court of Appeals reversed, holding that the statement allegedly overheard by the witness was admissible in evidence as a declaration against penal interest. The witness in *Atkins* was unknown to the declarant, and she was not a law enforcement officer.

We therefore conclude that the trial judge's differentiation between a statement to Ms. Norman and a statement to a law enforcement officer—"I mean, sure, if he tells it to a police officer or a prosecutor, but there's no jeopardy to tell you"—was erroneous as a matter of law. To the

---

**20.** We recognized in *Laumer,* 409 A.2d at 200, that a witness who exercises this privilege is unavailable.

extent, if any, that this misapprehension affected the judge's remaining findings, it reduces the weight which we must accord to them. *Murphy v. McCloud*, 650 A.2d 202, 210 (D.C.1994) (citations omitted).

### D. Corroboration.

■ The government argues, and the trial judge found, that Aleem's confession to Ms. Norman was entirely uncorroborated. We do not believe that the record bears this out.

■ We begin by noting that Rule 804(b)(3) does not require that *the information within the statement* be clearly corroborated; it requires only that there be corroborating circumstances that clearly indicate the trustworthiness of the statement itself. The corroboration requirement of this rule is a preliminary determination as to statement's admissibility, not an ultimate determination about the statement's truth. 5 WEINSTEIN'S FEDERAL EVIDENCE § 804.06(5)(b), at 804–63 (2d ed. 2005) (emphasis in original). "Significantly, the rule does not require that the statements themselves be independently proved to be accurate; rather it requires only that corroborating circumstances indicate trustworthiness." McCORMICK § 319, at 329. "It is the statement rather than the declarant [that] must be trustworthy." *United States v. Brainard*, 690 F.2d 1117, 1124–25 (4th Cir.1982). The requirement of corroborating circumstances warranting admission of statements against penal interest plainly goes beyond minimal corroboration, for the circumstances must "clearly" indicate the trustworthiness of the statement. Nevertheless, the standard is not "unrealistically severe." *United States v. Mackey*, 117 F.3d 24, 29 (1st Cir.1997).

As Judge Weinstein has written, "[e]vidence that the declarant was near the scene and had some motive or background connecting him with the crime should be sufficient corroboration." WEINSTEIN § 804.06(5)(b), at 804–66. This is the very kind of situation presented in this case. Aleem was on the scene, smoking marijuana and drinking with McKay and Ingram. According to Ms. Norman, Aleem indicated that he had a compelling motive to kill McKay and that he proposed to finish the job following his (Aleem's) release from jail.[21]

Material tending to corroborate Aleem's confession was contained in his grand jury testimony, notwithstanding Aleem's denial before the grand jury that he committed the crime. Aleem told the grand jurors that, upon his return to the area of the offense soon after it occurred, unidentified persons accused him of shooting at them and, perhaps implicitly, of being responsible for the shooting of McKay. Standing alone, anonymous accusations would be of little if any significance. When considered in conjunction with Aleem's subsequent confession, however, the context of those accusations becomes markedly different. A person may, of course, be wrongfully accused of a crime. It is also possible, though hardly the norm in human behavior, that an individual has voluntarily made a false confession. It is surely unusual, however, for the same person *both* to be wrongfully accused of a crime *and* to false-

---

**21.** Significantly, on the other hand, there is no indication that Aleem's confession was motivated by a desire to curry favor with the authorities, and should be disbelieved on that account. *United States v. Price,* 134 F.3d 340, 347–48 (6th Cir.1998); *United States v. Gar-*

*cia,* 897 F.2d 1413, 1421 (7th Cir.1990). Ms. Norman declined to disclose Aleem's stated motive, apprehending that it might also be deemed to constitute a motive applicable to her client, Ingram.

ly confess it. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C.1993) (citation omitted).

The trial judge's finding that Aleem's confession was uncorroborated thus rests on what we view as a somewhat improbable coincidence to which the judge evidently gave no consideration. We conclude that there was significant corroboration of Aleem's confession.[22]

### E. *Trustworthiness of the statement.*

■ Closely related to the foregoing discussion, and perhaps inseparable from it, is the question whether, as Fed. R. Evid. 804(b)(3) and *Laumer* require, the corroborating circumstances "clearly indicate the trustworthiness of [Aleem's] statement." Relying primarily on the fact that Aleem gave inconsistent accounts of what occurred and "lied through his teeth,"[23] the judge was of the opinion that Aleem's confession was unreliable and should not be presented to the jury unless the prosecution had the opportunity to cross-examine him. The "clearly erroneous" standard is a deferential one, and we must apply it accordingly.

But affirmance on the present record also presents difficulties. We are concerned here not with Aleem's trustworthiness, which is limited at best, but with the trustworthiness of his confession. Obviously, at some point in this case, Aleem has lied, and the judge's reluctance to trust a liar without exposing that liar to cross-examination is certainly understandable. The question is, however, when Aleem lied, was it when he denied that he shot McKay or when he confessed that he committed the crime?

There are reasons, grounded in common sense and common experience, suggesting that a confession is more credible than a denial of guilt. Confessions "are highly probative of a defendant's guilt[24] since we believe that it is unlikely that a rational person would admit to a crime if it were not true." *Laumer,* 409 A.2d at 197. If Aleem were prosecuted for shooting McKay, and if Ms. Norman testified that he had confessed to the shooting and had threatened to kill McKay after his (Aleem's) release from jail, Aleem could be sent to prison for a very long time. One wonders why Aleem would subject himself to such a fate if he was in fact innocent.

There are, of course, limits to this line of reasoning. Carried too far, it proves

---

22. The trial judge did not mention, in any of his rulings, Aleem's testimony that unknown persons accused him of involvement in the shooting, nor was the issue raised before him. Ms. Norman did not refer to this testimony either; indeed, the point could not have been raised by the defense in the trial court, for Ms. Norman had never seen a transcript of Aleem's grand jury testimony; her request for it, made pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), had been denied. Ingram's new appellate counsel referred to this part of Aleem's grand jury testimony in his first submission following his receipt of the transcript. In any event, Ms. Norman preserved in the trial court Ingram's claim that her proposed testimony regarding Aleem's confession was erro-

neously excluded, and Ingram's new attorney is free to present additional arguments in support of that claim. *Yee v. Escondido,* 503 U.S. 519, 535, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

23. In his Supplemental Memorandum Ingram's new counsel has put the matter more delicately writing that "in describing what occurred, Aleem dissembled."

24. Or, in this case, of a declarant's guilt. It is not implausible to believe "that a reasonable man in [Aleem's] position would not have made the statement [to Ms. Norman] unless he believed it to be true." *Laumer,* 409 A.2d at 199 (quoting Fed. R. Evid. 804(b)(3)).

too much, for its logic would require the admission of all such "third party confessions," *id.*, when the court in *Laumer* prudently required a meaningful showing that a statement against penal interest is trustworthy before such a statement may be admitted. Still, given most people's distaste for the prospect of long-term incarceration, a court should not readily conclude, in the absence of unusual circumstances, that an admission of guilt has been fabricated; human nature tells us that in most instances, it has not. Moreover, it is worth noting that the trial judge did not see or hear Aleem testify, so that the documents to which the judge had access are equally available to this court. Nevertheless, the trial judge is vested with significant responsibility in relation to the issue of the declarant's trustworthiness, *Laumer*, 409 A.2d at 199, and once the appropriate legal standards have been applied, we may not exercise the authority entrusted to him.

In sum, we are of the opinion that the question whether Aleem's confession satisfies the standard of trustworthiness adopted by this court in *Laumer* is a close one and is difficult to resolve on the present record. Its proper disposition may turn on the existence *vel non* of a motive for Aleem to shoot or kill McKay and on the application to the record of the legal principles set forth herein.

## F. *Remand.*

Ingram now has new counsel, and no ethical or legal barrier prevents Ms. Norman from testifying regarding Aleem's statement to her or from facing cross-examination by the government. We believe it to be in the interests of justice for the trial court, on remand, to hear Ms. Norman's testimony, which is likely to shed further light on the circumstances, and perhaps the trustworthiness, of Aleem's confession to her.[25] The trial judge, in the exercise of his discretion, may permit the parties to present any additional evidence that may be relevant to this issue. The judge should then determine anew, in conformity with the principles set forth in this opinion, whether Aleem's jailhouse confession qualifies as a statement against penal interest and should therefore be heard by the jury. The case is remanded to the trial court for that purpose.[26]

*So ordered.*[27]

---

25. "In determining whether the declarant in fact made the proffered statement, the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration." *Doret*, 765 A.2d at 64 (quoting *Laumer*, 409 A.2d at 199).

26. If the trial judge determines that Aleem's statement should have been admitted, then he must order a new trial.

27. The remaining issues raised by Ingram do not require extensive discussion. The judge did not abuse his discretion by admitting into evidence the pistol recovered from the stolen automobile in which Ingram's brothers were involved in an accident, or the ammunition seized from the dresser drawer; these items were direct evidence of Ingram's guilt, and the judge could reasonably conclude that they were not more prejudicial than probative. *Johnson v. United States*, 683 A.2d 1087, 1101 (D.C.1996) (en banc); *Mercer v. United States*, 724 A.2d 1176, 1185 (D.C.1999). Assuming, without deciding, that Ingram has preserved for appeal his contention that the testimony of the government's ballistics expert should not have been admitted, we are satisfied that the judge's decision was neither "manifestly erroneous," *In re Melton*, 597 A.2d 892, 897 (D.C.

1991) (en banc) (quoting *Coates v. Unites States*, 558 A.2d 1148, 1152 (D.C.1989), nor an abuse of discretion). *Griggs v. United States*, 611 A.2d 526, 527–28 (D.C.1992). Substantially for the reasons stated in the government's brief, the evidence, viewed in the light most favorable to the prosecution, was sufficient to support each of Ingram's convictions. *See, e.g., Fletcher v. United States*, 335 A.2d 248, 250–51 (D.C.1975) (assault with intent to kill while armed); *Gathy v. United States*, 754 A.2d 912, 917 (D.C.2000) (aggravated assault while armed). Ingram's convictions of assault with intent to kill while armed, aggravated assault while armed, and possession of a firearm during the commission of a crime of violence, do not merge; each offense contains an element which the others do not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Nixon v. United States*, 730 A.2d 145, 148–52 (D.C.1999).