Vincent ANDREWS, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CF–1682.

District of Columbia Court of Appeals.

Argued May 5, 2009.

Decided Sept. 3, 2009.

James Whitehead, Public Defender Service, with whom James Klein, Jonathan W. Anderson, Samia Fam and Lee R. Goebes, Public Defender Service, were on the brief, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before REID, KRAMER, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

This is a case of police depravity. In November 1999, appellant Vincent Andrews, then a Metropolitan Police Department officer, was convicted by a jury of first-degree sexual abuse of a ward,[1] tampering with physical evidence,[2] and obstruction of justice.[3] In addition, the trial court found Andrews guilty of simple assault.[4] The jury acquitted him of second-degree sexual abuse of a ward.[5] Andrews' convictions arose out of his insistence on having sex with a prostitute, Antoinette Keys, whom he had just arrested and taken into police custody. Ms. Keys, having been subjected to demeaning treatment and sexual abuse of a verbal nature in prior encounters with members of the MPD, felt that Andrews' conduct "had gone too far." She accordingly hid the condom she used in performing oral sex on Andrews in her clothing, planning to report the assault to Andrews' superiors and to use the condom as physical evidence of the sexual act. For his part, Andrews was desperate to cover up his actions. Suspecting that Keys had saved the condom despite telling him she had thrown it away, he grabbed her by her arm and pushed it behind her back and started beating her head against the table in the police station conference room, threw her on the floor, ripped off her pants and panties, grabbed the condom from between her buttocks, and flushed it down the toilet—all in the presence of other MPD officers who did nothing to stop him.

On appeal, Andrews first argues that the trial court improperly excluded a statement that Latasha Turner, another prostitute who was arrested with Keys, made to a police officer about Turner and Keys "setting up" the officers who had arrested them. We reject this argument, holding that the statement was properly excluded as hearsay. We therefore affirm Andrews' convictions for first-degree sexual abuse of a ward, tampering with physical evidence, and simple assault. Second, Andrews argues that the government presented insufficient evidence to support the obstruction of justice charge. Andrews' conduct, although reprehensible, does not fit within the statutory definition of obstruction of justice charged by the government and we therefore reverse his conviction on that count.

## I. FACTS

In 1998, Andrews was working as a police officer in the vice squad of the D.C. Metropolitan Police Department. On the night of September 14, 1998, Andrews and two fellow officers, Bundy and Tyler, were working as undercover vice officers near 11th and M Streets, Northwest. Bundy and Tyler were sitting in a jeep when Keys approached the vehicle with her friend Turner. Keys, believing that Bundy and Tyler might be police officers, testified that she approached Bundy on the passenger's side of the jeep and asked him to "pull his penis out and put his hand down [her] shirt and feel [her] breasts and to give [her] a dollar," all as a means of determining whether or not the men were officers because "police officers are not supposed to do those things if they are cops." According to Keys, Bundy did pull his penis out and touched her breast, although she did not remember whether he gave her the dollar. Turner allegedly performed the same "test" with Tyler outside

1. D.C.Code § 22–4113 (1981).

2. D.C.Code § 22–723 (1981).

3. D.C.Code § 22–722(a)(3)(B) (1981).

4. D.C.Code § 22–504 (1981).

5. D.C.Code § 22–4114 (1981).

the driver's side of the jeep. The women then got into the jeep, with Keys sitting in the back seat with Bundy and Turner in the front seat with Tyler. As soon as the officers and the women reached an agreement to exchange sex for money, Tyler turned on the jeep's hazard lights as a pre-arranged signal to Andrews, who was observing from a nearby car. Andrews approached the jeep and assisted in the arrest of Turner and Keys for solicitation of prostitution. Tyler drove the jeep back to the police station and parked it in front of the building. Andrews drove separately back to the station.

Keys testified that the officers took her and Turner into the Snyder Conference Room at the police station and that the officers sat with the women at a table and filled out paperwork related to their arrests. Keys testified that her goal during this process was to be released on a citation, as opposed to being processed through "central booking." In her past experience, when she had been arrested for solicitation and had her driver's license with her as identification, the police would release her on a citation, which meant that she was released from custody a few hours after her arrest and given a future court date. The alternative, when she did not have her identification, was that the police would process her through central booking and she would have to spend the night in the city's central jail.

When she was first arrested, Keys had asked to use a telephone because she wanted someone to bring her identification to the station to increase her chances of getting released on a citation. The officers had not allowed her to use the telephone, but had begun filling out paperwork associated with the arrests. Andrews was only "minimally" involved during this process and walked in and out of the room several times. During

this time, "there was a lot of sexual talk going back and forth" between Tyler and Bundy and the two women. Keys testified that she tried to laugh off any sexual comments the officers made during her processing so that the officers would release her on a citation. Bundy testified that Turner told him that if the police released her, she would have sex with them, but that the officers had laughed off this offer.

At some point during the processing, Andrews came into the room with a Polaroid camera and took a mug shot-style photo of Keys at the back of the conference room. Keys testified that after he took the photo, Andrews took Keys' hand and put it on his erect penis. Keys stated that she pulled her hand away, but Andrews grabbed her hand and put it on his penis again. Although Keys felt the situation "was getting out of hand," she did not protest because she wanted to expedite her release and thought that someone would "slow up her paperwork" or make her go to the cell block if she complained. Andrews then told Keys he needed to take her property, something that Keys said the police normally didn't bother doing. Nonetheless, Andrews took off Keys' necklaces by standing behind her and pressing his penis up against her buttocks, telling her repeatedly to "stick [her] butt out" in a way that would have pushed her buttocks more against his penis. Andrews then took sexually suggestive photos of Turner. Andrews said he wanted a photo of the women together and directed Keys to lift up her skirt while he took a picture of the two women. At the time Andrews was taking these photos, Bundy and Tyler were at the conference room table. They testified that they were aware Andrews was taking photos of the women, but said they were not paying attention.

Andrews then took Keys to make the phone call she had asked to make earlier. When Keys finished making her call, Andrews told her to come with him and they walked outside the police station and approached the jeep in which the police had earlier arrested Keys and Turner. The door to the jeep was locked, so Andrews walked back into the police station and asked Tyler for the keys. Tyler gave Andrews the keys and Andrews again told Keys to come with him as he walked out to the jeep. Andrews and Keys got into the jeep and Andrews drove a couple of blocks away from the police station. He parked the jeep and, when Keys mentioned that he was at a fire hydrant, he told her "it didn't matter because he was the police." He and Keys then moved from the front seat to the back seat, where Andrews pulled his erect penis out of his pants and told Keys that he "would like to see [her] pretty lips on here." Keys put a condom on Andrews and performed fellatio on him. When she was finished, and while Andrews was "getting himself together," she took off the condom, tied it with a knot, and slid it into her underwear between her buttocks. She intended to "tell on him" because she was angry that "things had gone too far." Andrews then came around to Keys' side of the car and searched the ground with a flashlight while asking her where the condom was. Keys told Andrews that she had thrown the condom on the street, and when Andrews was not able to find it, he got back in the car and drove back to the station. On the way, Keys asked Andrews if she was "going to get out" on a citation and Andrews said that he would "process [her] out" and give her a later court date.

After they returned to the police station, Keys told Andrews she needed to go to the bathroom. Andrews took her to the ladies' bathroom and stood outside as Keys went in by herself. While in the bathroom, Keys wrapped the condom in a piece of toilet paper because she was worried about Andrews' semen seeping out of the condom and then she put the toilet paper containing the condom back between her buttocks. Keys and Andrews then went back to the conference room and Keys sat next to Turner, telling Turner "not to worry" because she was "going to tell."

Andrews seemed to become suspicious of Keys shortly after their return to the conference room. He offered to take her to make another phone call even though, as Keys testified, "if you can get one phone call, it's a miracle." Keys declined Andrews' offer because she already had called a friend to bring her identification. Andrews offered again. Again, Keys declined. Andrews then said he needed to talk to her outside the conference room, and she acquiesced. He asked her where the condom was and she told him that it was outside on the street. Keys then "panicked" and went "flying back" into the conference room, saying to Andrews that he should get a sergeant. She testified that she knew she had the condom, and she feared Andrews was becoming suspicious, so she wanted to talk to a sergeant about the incident. Upon reentering the conference room she repeatedly asked the other officers there to get a sergeant. Andrews followed her into the conference room and Keys told him that if he wanted to speak to her anymore, he would need to get a sergeant.

Andrews briefly left the conference room to get a sergeant as Keys had requested. Keys testified that when he came back, but before a sergeant had arrived, he grabbed her arm, pushed it behind her back and started beating her head against the table and saying she had drugs on her person. Officers Bundy and Tyler testified they did not recall Andrews beating Keys' head against the table, but

that Andrews threw Keys to the floor. Andrews then ripped Keys' underwear off her body and put his hand between her buttocks as he tried to get the condom, which fell from Keys' body. All the while, Keys was screaming but no one came to her assistance. Andrews picked up the tissue containing the condom and ran to the door. Another officer testified that he saw Andrews run from the conference room and toward a nearby bathroom.

Other officers then entered the room and interviewed Keys about what had happened. Keys described her interaction with Andrews and where he had taken her in the jeep. She told the officers that Andrews had parked the jeep in a parking space next to a fire hydrant and that she had thrown a condom wrapper on the street next to a rock that had a wet spot on it. Keys testified that one officer told her "I promise you, I swear to you on God, my children, if you tell me that you're not telling the truth you won't be in no trouble, we'll process you out and you'll get right out." Keys responded that she "understood [being a] team player and [she] understood the things he was saying to [her], but regardless it had happened." The investigating officers then took her a couple of blocks away so that she could show them where she and Andrews had been. The location appeared as Keys had described; there was a fire hydrant with a rock and wet spot on it next to the parking space. Later the same night, police officers found the suggestive photos Andrews had taken of Turner and Keys in an office where Andrews had been sitting while waiting to speak to his supervisors.

Before the grand jury, Police Officer Gwendolyn Mapp testified that at some point during the evening Turner told her that she and Keys "were trying to set up— were trying to get the officers to take a bait. . . . She said the two young guys, . . . [Tyler and Bundy] didn't take the bait, but the older guy . . . [Andrews] took the bait." After her release from police custody but before her court date, Turner disappeared. Although the court issued a warrant for her arrest, she was not seen again and was therefore unavailable at Andrews' trial.

## II. ANALYSIS OF ISSUES ON APPEAL

### A. Statement Against Penal Interest

■ At trial, Andrews sought to introduce Officer Mapp's grand jury testimony recounting Turner's statement to establish that Keys was the instigator of the sexual encounter with Andrews. The trial court determined that the statement was inadmissible hearsay, but Andrews argued it was admissible as a declaration against penal interest because it tended to show that Turner and Keys had tried to bribe police officers with sexual favors in exchange for their release from custody. Under this exception to the hearsay rule, a statement against penal interest is admissible because it is "unlikely that a rational person would admit to a crime if it were not true." *Laumer v. United States*, 409 A.2d 190, 197 (D.C.1979) (en banc) (adopting the statement against penal interest hearsay exception set forth in Fed.R.Evid. 804(b)(3)).

■ *Laumer* set forth a three-part inquiry for the trial court's determination whether to admit a statement under this exception. First, the court must determine whether the declarant made the statement. 409 A.2d at 199. Second, the court must determine that the declarant is unavailable. *Id.* Third, the proponent of the statement must demonstrate "that there exist corroborating circumstances that clearly indicate the trustworthiness of the statement." *Id.* The trial court's con-

clusion that a statement is or is not against the declarant's penal interest is a question of law, *Ingram v. United States,* 885 A.2d 257, 263 (D.C.2005) (citing *Laumer,* 409 A.2d at 203), and we therefore conduct a *de novo* review of the trial court's ruling. *Ingram,* 885 A.2d at 263.

The first and second prongs of the inquiry are not in dispute here. The trial court determined that Turner made the statement about which Mapp testified and Turner disappeared prior to trial. In considering the third prong of the inquiry, however, the trial court concluded that the statement was not clearly against Turner's penal interest but rather was ambiguous. The court explained that there could have been at least two interpretations of Turner's statement. Under one interpretation, Turner and Keys were just "trying to get the police officers in trouble" but, interpreted another way, Keys and Turner had attempted to bribe the officers. The court determined that, because of its ambiguity, the statement was not so clearly against Turner's penal interest as to provide the necessary degree of confidence in its reliability. The court therefore excluded the statement as hearsay.

We agree with the trial court's ruling. As the trial court discussed with counsel, Turner did not use the word "bribe" and she didn't talk about exchanging "sexual favors" for the women's release from custody. Importantly, Andrews' counsel agreed with the trial court that Turner's statement was susceptible to more than one interpretation but continued to press his understanding of the statement. But if there are two possible interpretations of Turner's statement (and we find *at least* two interpretations possible here), one of which would subject Turner to criminal liability while the other would not, the necessary indicia of trustworthiness are absent. Indeed, statements against penal interest "are reliable, and therefore admissible, precisely insofar as they genuinely increase the declarant's exposure to criminal sanction." *Thomas v. United States,* No. 05–CF–299, 2009 WL 2610951, at *7 (D.C. Aug. 27, 2009) (citing *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). In this case, we cannot know that Turner thought she was making a statement that exposed her to criminal liability. Instead, the colloquy between the trial court and counsel more than adequately supports the court's conclusion that the statement was ambiguous and was correctly excluded as hearsay.

Indeed, we have trouble discerning any clear meaning at all from Turner's statement. There is no evidence in the record to corroborate the statement that Turner and Keys tried to "set up" all three (or any) officers. Prior to their arrest, Turner and Keys actually tried to determine that Bundy and Tyler were *not* police officers because they did not want to find themselves in exactly the situation that unfolded. After their arrest, there does not appear to have been any time at which the two women had an opportunity to concoct a "set-up" out of the hearing of the various officers arresting them and taking them to the station; on the contrary, the women did not speak privately with each other until *after* Andrews brought Keys back to the station after his sexual assault of her in the jeep. And while Turner allegedly offered to have sex with the officers in exchange for her release—presumably, the "bait" about which Turner was speaking—there is no testimony that Keys made any similar offer. We thus conclude that the necessary corroborating circumstances required under *Laumer,* 409 A.2d at 199, to establish the trustworthiness of the hear-

say statement were totally lacking here.[6]

## B. Obstruction of Justice

██ The government charged Andrews under three different provisions of the D.C.Code all designed to punish obstruction of justice in its various manifestations. One charge, under D.C.Code § 22–723, correctly targeted Andrews' "tampering with physical evidence" by assaulting Keys to get the condom off her person and then flush it down a toilet. The jury convicted Andrews of this charge, and Andrews does not make any serious argument that the government's evidence was insufficient to support the conviction.

The government also charged Andrews with two additional counts of obstruction of justice, one under D.C.Code § 22–722(a)(3)(B) and one under D.C.Code § 22–722(a)(6). The trial court dismissed the charge under Section 22–722(a)(6), ruling that the alleged act of obstruction under that subsection must occur in an ongoing "official proceeding" but that here there was no "official proceeding" pending at the time Andrews assaulted Keys to get the condom. The court reached a different conclusion with respect to the charge under Section 22–722(a)(3)(B), however, concluding that under that subsection there need not yet have been an "official proceeding" and that Andrews' use of "physical force ... to seize evidence from [Keys] at a time when she was indicating a desire to speak with an official, presumably to report this crime," satisfied the government's burden to adduce sufficient evidence to send the case to the jury.

We focus our review on the specific statutory language Andrews was charged with violating. D.C.Code § 22–722(a)(3)(B) makes it a crime to "harass another person with the intent to *hinder, delay, prevent, or dissuade* the person from *reporting* to a law enforcement officer the commission of, or any information concerning, a criminal offense." (Emphasis added.) The government essentially concedes that Andrews' assault on Keys to get the condom was not intended to "prevent" or "dissuade" her from "reporting" the crime, but argues that he did intend to "delay" or "hinder" her "report" while he destroyed the evidence (the condom) in order to make her inevitable "report" less credible.

The government asks us to engage in a leap of logic that we cannot countenance. If anything, Andrews' dramatic and violent assault on Keys, made in the conference room of a police station and in the presence of three witnesses, two of whom were themselves police officers, almost certainly *accelerated* Keys' "report" of a crime rather than "hindered" or "delayed" it. Andrews' actions in the conference room were *guaranteed* to cause Keys to report his sexual assault of her in the jeep and constituted the antithesis of conduct intended to "hinder" or "delay" her "report," especially given that he already had acquiesced in Keys' request to get a sergeant to come to the conference room. Even applying our well-settled standard of evaluating the evidence in the light most favorable to the government, *see, e.g., Harkins v. United States,* 810 A.2d 895, 900 (D.C.2002), we cannot say that a reasonable jury could have found that Andrews intended to "hinder" or "delay" Keys' "reporting" of the assault when he attacked her in the police station in the presence of other officers.

---

**6.** The trial court also excluded the statement on the alternative ground of relevance, ruling that any attempt by Keys to "set up" or "bribe" Andrews would not have exonerated him because consent is not a defense to the charge of sexual abuse of a ward. That alternative ground for exclusion likewise seems correct, as does the trial court's fear that the statement would have confused the jury.

Andrews cites the legislative history of D.C.Code §§ 22–722(a)(3)(B) and 22–723 in support of his argument that the D.C. Council intended to distinguish between situations in which witnesses are subjected to "harassment and intimidation" that prevented them from coming forward with information about criminal acts they had witnessed (the animating force behind the enactment of D.C.Code § 22–722(a)(3)(B)), on the one hand, and protecting the availability and integrity of physical evidence, on the other hand (the animating force behind the enactment of D.C.Code § 22–723).[7] We agree with the government that the words of both statutes are sufficiently clear that resort to the legislative history is not necessary, but we cannot accept the government's contention that Andrews' obvious intent to destroy physical evidence (the condom) also proved that he had the intent to "delay" or "hinder" Keys' "reporting" of his assault just long enough for him to destroy physical evidence, thereby bringing his conduct within the ambit of both statutes. It is of course true that the same conduct may violate more than one statute, *see, e.g., Smith v. United States,* 591 A.2d 229, 232 (D.C.1991), but here Andrews' single-minded purpose was on destruction of the physical evidence and, so far as the record reveals, not at all on delaying or hindering Keys' reporting of the assault. In short, the trial court should have dismissed the charge under D.C.Code § 22–722(a)(3)(B), just as it dismissed the charge under D.C.Code § 22–722(a)(6).

## III.   CONCLUSION

We affirm the trial court's judgment of conviction on the counts of first-degree sexual abuse of a ward, tampering with physical evidence, and simple assault. We reverse the judgment of conviction on the obstruction of justice count.[8]

*Affirmed in part and reversed in part.*

---

7.   *Compare* Council of the District of Columbia, Committee on the Judiciary, Report on Bill 9–385: "The Law Enforcement Witness Protection Amendment Act of 1992," at 2–3 (May 20, 1992) (Council's purpose in enacting D.C.Code § 22–722(a)(3)(B) was to address the "code of silence" contributing to a reluctance by citizens to report serious crimes and to "promot[e] the integrity of judicial and other proceedings" by "protecting witnesses" from harassment and intimidation so that they could come forward and "report[ ] criminal activity") *with* Council of the District of Columbia, Committee on the Judiciary, Extension of Comments on Bill No. 4–133: "The District of Columbia Theft and White Collar Crime Act of 1982," at 103 (July 20, 1982) ("[c]urrently there is no specific statute in the local criminal code which addresses [tampering with physical evidence]").

8.   Because the trial court imposed concurrent sentences for the counts on which Andrews was convicted, the reversal of his conviction for obstruction of justice does not require us to remand for resentencing.