**Darion J. INGRAM, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 06–CF–668.**

District of Columbia Court of Appeals.

Argued Sept. 16, 2008.
Decided July 23, 2009.

Robert S. Becker, Washington, DC, appointed by the court, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Glenn S. Leon, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and KRAMER, Associate Judges.

REID, Associate Judge:

We previously remanded this case for further proceedings regarding a contention by appellant, Darion J. Ingram, that the trial court erred by failing to admit into evidence an alleged statement against penal interest made by a third party, Jameel Aleem. *See Ingram v. United States,* 885 A.2d 257 (D.C.2005) (*Ingram I* ). Following an evidentiary hearing on remand, the trial court made findings of fact and conclusions of law, and again excluded Mr. Aleem's statement to Mr. Ingram's trial counsel confessing that he shot the victim. Mr. Ingram once again challenges the trial court's exclusion of Mr. Aleem's statement. We affirm the judgment of the trial court.

## FACTUAL SUMMARY

We need not repeat the entire factual summary of the events surrounding the shooting and wounding of Maurice E. McKay on November 5, 2001, and Mr. Ingram's July 2002 trial. *See Ingram I,* 885 A.2d at 261–63. The critical aspect of the trial centered on the trial judge's ruling that Mr. Aleem's confession to the shooting of Mr. McKay could not be admitted into evidence because Mr. Aleem "was an unreliable witness whose account [of the shooting] should not be received in evidence unless [Mr.] Aleem was subject to cross-examination by the government"; and that Mr. Aleem's statement, as proffered by defense counsel, did not "have sufficient indicia of reliability to be allowed to come into evidence as a statement of penal interest under *Laumer v. United States*[, 409 A.2d 190 (D.C.1979) (en banc)] . . . ." *Id.* at 261. Prior to our decision in *Ingram I,* we "remanded the record to the trial court for additional findings relating to [Mr.] Aleem's grand jury

testimony and for any clarification of [the court's] rulings ... that the trial judge wished to make." *Id.* at 262. After receiving the trial court's April 12, 2005 supplemental findings, we subsequently issued our decision in *Ingram I.*

In *Ingram I,* we ultimately concluded "that the question of whether [Mr.] Aleem's confession satisfies the standard of trustworthiness adopted by this court in *Laumer* is a close one and is difficult to resolve on the present record."[1] *Id.* at 268. We further stated that the "proper disposition may turn on the existence *vel non* of a motive for [Mr.] Aleem to shoot or kill [Mr.] McKay and on the application to the record of the legal principles set forth [in *Ingram I* ]." *Id.* Consequently, we remanded the case to the trial court so that it could hear the testimony of defense counsel concerning Mr. Aleem's alleged statement against penal interest, and any other evidence relevant to that issue. We indicated that following the evidentiary hearing, the trial court should decide whether to allow the jury to hear Mr. Aleem's statement, and if so, to order a new trial. *See also id.* at 268 n. 26.

During the remand hearing, Jane Norman, Mr. Ingram's trial counsel, testified for the defense. The trial judge summarized her testimony in his factual findings on remand. Ms. Norman "had five meetings with Mr. Aleem and, in a sixth meeting, which she did not attend, her investigator took a signed statement from Mr. Aleem, given 'under penalty of perjury.' " However, Ms. Norman "cannot locate her file, there are no extant notes of her conversations with Mr. Aleem, and she cannot produce a copy of Mr. Aleem's signed statement taken by her investigator." In all but one of the conversations with Ms. Norman, and in his signed statement to the investigator, Mr. Aleem stated that Mr. McKay was "shot by a rival group from the neighborhood and not by [Mr.] Ingram." In that one conversation, Mr. Aleem maintained that Mr. McKay was shot by a rival group, but he "used different names for the persons in the rival group who supposedly shot [Mr.] McKay," and he "dismissed [Ms. Norman's] misgivings ... and told her to 'just use those [the original] names then.' " Because of Mr. Aleem's "eager[ness] to testify to help [Mr. Ingram]," Ms. Norman "became suspicious and accused [Mr.] Aleem of being some sort of 'all purpose witness,' which he denied." When Ms. Norman "asked [Mr.] Aleem directly whether he was the one who shot [Mr. McKay] ..., [he] responded: 'Are you kidding? If I had shot [Mr. McKay], he wouldn't still be alive.... Some fool shot him at point blank range and missed. I would never miss."

Ultimately, Ms. Norman decided not to call Mr. Aleem as a defense witness during Mr. Ingram's trial. When she relayed this decision to Mr. Aleem when she visited the jail to prepare Mr. Ingram for trial, Mr. Aleem "put his head in his hands, made a sigh that sounded like crying, and said, as Ms. Norman recalls it from memory: 'I'm the one who wasted Moe [Mr. McKay], and my only regret is I didn't finish him off, but I'm going to take care of that when I get out.' " Mr. Aleem added: "And don't worry about the trial. I'm going to have anyone who testifies against [Mr. Ingram] ... killed and their families." When Ms. Norman inquired about Mr. Aleem's motive for allegedly shooting Mr. McKay, "he

---

1. We also "conclude[d] that there was significant corroboration of [Mr.] Aleem's confession ( [Mr.] Aleem's [grand jury] testimony that unknown persons accused him of involvement in the shooting"). *Id.* at 267 n. 22.

We declared that "the trial judge's differentiation between a statement to [his trial counsel] and a statement to a law enforcement officer ... was erroneous as a matter of law."

explained that he (Aleem) was the leader of a gang of 'youngins' whose members did what he said and that [Mr.] McKay was a member who had been causing him trouble by not doing what he was told and by committing a daytime robbery, which brought the group unwanted attention." Ms. Norman believed that Mr. Aleem was telling the truth when he confessed to the shooting of Mr. McKay because "[h]e looked her in the eye when he said it, and he seemed more serious than he had appeared in any prior conversation." But Ms. Norman became "frightened" by his threats and "never spoke to Mr. Aleem again." She thought Mr. Aleem "trusted" her because they "had a good rapport" and "got along real well"; and he didn't think she "would tell anybody" about his confession. Findings of Fact and Conclusions of Law on Remand, May 16, 2006, at 3–5 ("Findings on Remand").

Detective Ray Anthony Crawford of the Metropolitan Police Department, testified for the government. The trial judge found that he was one of the lead detectives in the case involving the shooting of Mr. McKay. According to him, Mr. McKay identified Mr. Aleem as a person who was on the scene at the time of the shooting and "who witnessed [Mr.] Ingram shoot him[, that is, Mr. McKay]." During Detective Crawford's investigation, Mr. Aleem was incarcerated in connection with another case. Detective Crawford attempted to interview him about Mr. McKay's shooting on two occasions, and on the third time, he decided to put Mr. Aleem before the grand jury because of his hostility.[2] The trial judge described Mr. Aleem's grand jury testimony as "evasive" and "flatly at odds with his final unsworn version, in which he

claimed to Ms. Norman that he was the one who shot [Mr.] McKay." Furthermore, the trial judge determined that a summer 2002 mental health evaluation of Mr. Aleem revealed that although he was "competent," he had "an extreme personality disorder, including, among other features, 'deceitfulness, or conning others for personal profit or pleasure.'" Moreover, Mr. Aleem had a "history of drug abuse" (heroin, powder cocaine, PCP and hallucinogens), and "[b]etween May 6 and May 20, 2002, [he] ... tested positive for PCP ... five times, as well as marijuana (three times) and opiates (one time)." Findings on Remand, at 6–7.

At the remand hearing, counsel for Mr. Ingram moved for a new trial on the ground that in failing to turn over the April 2002 grand jury transcripts of Mr. Aleem and another man, Albert Montgomery, before Mr. Ingram's July 2002 trial, the government had violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mr. Aleem appeared before the grand jury on April 11, 2002. In response to a question, Mr. Aleem told the grand jury that he "believe[d]" he was aware that someone was shot in the 4500 block of Dix Street, in the Northeast quadrant of the District, in November 2001. He "believe[d]" he was "hanging out with [Mr. Ingram] that night." Others were present, including "Jason or something like [that]." They were smoking. When asked whether he was "familiar with the fact that [Mr. McKay] was shot in the middle of [an] alley, the back alley of Dix Street," he responded: "I don't know where he got shot at really." Mr. Aleem did not remember where he was when he heard shots, or who was with him, but he

---

**2.** During Detective Crawford's first attempt to interview Mr. Aleem, Mr. Aleem tried to throw a chair at the detective, despite the fact that he was handcuffed around his waist and had shackles on his legs. Mr. Aleem was belligerent the second time the detective tried to speak with him.

remembered that he "started running." Mr. McKay "might have been" next to Mr. Aleem at the time of the shooting, but Mr. Aleem did not know. He "believe[d]" he saw Mr. Ingram when he heard the shots, but there "was a lot of movement going on, plus [he] was smoking," so he did not "really remember what went down." He just remembered hearing the shots and running to his car. He got into his car and sat there "for a minute." He did not know who shot Mr. McKay. He was "confused" and his "head was just going everywhere." He was "trying to get [his] missile [that is, his gun,] to see what happened, see what was up," but he claimed that he did not get his gun.[3] After composing himself, Mr. Aleem walked back to the alley. He was "high." Some unidentified people were "[t]rying to say [Mr. Aleem] was busting at them," and they asked if he "[w]as shooting at them?" Mr. Aleem told the grand jury that he didn't have anything to do with the shooting.

Mr. Montgomery appeared before the grand jury on April 10 and 11, 2002. On the night of the November 2001 shooting of Mr. McKay, Mr. Montgomery was drinking and hanging out with others, including Jason, Nic, and Jabrie, but not Mr. McKay or Mr. Ingram. Mr. Montgomery was located at the top of the alley in the 4500 block of Dix Street, Northeast, by a vacant house. He saw Mr. McKay come into the alley with two other people, Mr. Ingram and "Snags."[4] Later, when Mr. Montgomery heard shots fired in the alley, Mr. Ingram was "a good 80 feet from [him]," and "Snags" also was behind him.

At the sound of the first shot, which came from "the middle of the alley ... in the dark part," Mr. Montgomery turned and glanced back. He saw the victim fall, but he did not see Mr. McKay. As Mr. Montgomery put it, "I wasn't that close to actually see that." He began to run and heard two more shots. Eventually he stopped running and around thirty to forty-five minutes later, he heard police and ambulance sirens. About one hour later, as people began to gather in the alley, he saw Mr. Ingram and noticed that he had on a different shirt. Mr. Montgomery did not tell police officers or detectives, or anyone else about the shooting because he "didn't know [any]thing about it [himself]." He did not see the shooting; no one told him who shot Mr. McKay; and he did not know why Mr. McKay was shot. About one and one-half years before his grand jury appearance, Mr. Ingram showed Mr. Montgomery a .380 caliber gun which was located in a hiding place behind Mr. Ingram's house; "everybody on the block probably will hide something ... there."

In his conclusions of law, the trial judge stated, in part:

> Without knowing Jameel Aleem's subjective state of mind at the time he decided to claim credit for the shooting of [Mr.] McKay in the last of his many and various versions of the events of November 5, 2001, it is impossible to know why he would say he was the one who shot [Mr.] McKay if he was not.... Whatever may have been [Mr.] Aleem's subjective state of mind when he decided to take credit for shooting [Mr.]

---

3. Mr. Aleem denied seeing Mr. Ingram while he, Mr. Aleem, was incarcerated in the District of Columbia Jail on an unrelated charge. However, he admitted seeing Mr. McKay in the Jail and talking with him about the November 2001 shooting, but he never revealed the substance of their conversation.

4. The government's brief identifies "Snags" as Mr. Aleem, but Mr. Montgomery indicated before the Grand Jury that he did not know the real name of "Snags." Before the Grand Jury, Mr. Aleem asserted that one of his nicknames is "Nino," and that a few people called him "Snags."

McKay, the test for admissibility of a declaration against penal interest is an objective one. *Laumer*, 409 A.2d at 201 n. 15. The court asks: would a reasonable person in the declarant's shoes have made the statement if he did not believe it to be true? *Id.* Based on all the evidence presented both at trial and on remand, the court answers that question in this case in the affirmative. In the court's view, considering what is known about this declarant, the timing of his statement, the person to whom it was made, the declarant's apparent lack of appreciation of the disserving quality of his statement or the extent to which it was really against his penal interest, and the absence of any other meaningful evidence to corroborate the truth of the statement, in contrast to the powerful evidence of its falsity, the statement of [Mr.] Aleem to Ms. Norman is not admissible because the corroborating circumstances do not clearly indicate its trustworthiness. *Laumer*, 409 A.2d at 199; Fed.R.Evid. 804(b)(3).

Findings on Remand at 16–17 (footnote omitted).

## ANALYSIS

### The Declaration Against Penal Interest Issue

Mr. Ingram challenges the trial court's "findings and legal conclusions following the evidentiary hearing," claiming that they "conflict with the Panel's holding on direct appeal." He also maintains that the judge on remand "never answered the Panel's question": whether " 'when [Mr.] Aleem lied, was it when he denied he shot [Mr.] McKay or when he confessed that he committed the crime.' " Furthermore, Mr. Ingram places considerable emphasis on a statement early in the trial court's analysis: "By far the most important factor in this court's analysis is the overwhelming evidence of defendant's guilt and the utter lack of evidence that corroborates [Mr.] Aleem's 'confession.' " Mr. Ingram contends that "[p]redicating the admissibility, under the rules of evidence, of defense evidence on the strength of the government's case deprives the defendant of his right under the Fifth and Sixth amendments to present a complete defense." Furthermore, Mr. Ingram maintains that "the fact that [Mr.] Aleem had established rapport with [Mr.] Norman supports a finding that the confession was trustworthy." Mr. Ingram also insists that the evidence at trial corroborated Mr. Aleem's confession because (a) Mr. Aleem had a motive for shooting Mr. McKay; (b) his testimony showed that he had a "missile" (gun) and "it would be reasonable for the jury to infer that he ran to [his] car to hide the gun before he returned to the scene"; (c) since Mr. Aleem in his grand jury testimony and Mr. Ingram in his trial testimony stated that Messers. Ingram, McKay and Montgomery "had been smoking marijuana for several hours before the shooting . . . , it is reasonable to infer that [Mr.] McKay was under the influence of narcotics, if not alcohol [according to the grand jury testimony of Mr. Montgomery], when he was shot"; (d) Mr. McKay's attention was focused on Mr. Aleem and Mr. Montgomery when he was on the ground and "it is reasonable to infer that [Mr.] Aleem was the shooter and that's why he and [Mr.] McKay 'looked eye to eye' "; and (e) based on the testimony of Dr. Bikram Paul who treated Mr. McKay's wounds at the Washington Hospital Center, that the second shot entered Mr. McKay's buttocks, "it is reasonable to infer that due to the effects of the marijuana, loss of consciousness, or both, [Mr.] McKay never saw who shot him in the buttocks." Finally, Mr. Ingram contends that the trial court "focused on the absence of facts corroborating [Mr.] Aleem's con-

fession, not, as [we] instructed [in *Ingram I* ] on the presence of corroborative circumstances."

The government argues that a number of factors substantiate the trial court's finding that Mr. Ingram "failed to meet his burden of showing that corroborating circumstances clearly indicated the trustworthiness of [Mr.] Aleem's statement [of confession]": (1) "[t]he timing of [Mr.] Aleem's statement casts doubt on its reliability" since he did not make his statement until eight months after the shooting of Mr. McKay; (2) he did not confess to "a close friend or relative" but to Mr. Ingram's trial counsel with whom he had no prior relationship; (3) Mr. Aleem's "subjective, albeit incorrect, belief that his statement could not be used against him"; and (4) the lack of "sufficient corroboration of [Mr.] Aleem's statement." With respect to corroborating circumstances, the government claims that: (a) Mr. Aleem's articulation of his motive for shooting Mr. McKay "does not establish the trustworthiness of his statement" because the "motive came only from the mouth of [Mr.] Aleem"; (b) Mr. Aleem's grand jury testimony that bystanders "accused him of shooting [Mr.] McKay" "does not provide the clear indication of trustworthiness required to admit his statement";(c) "all the evidence pointed away from Mr. Aleem and toward [Mr. Ingram] as the shooter"; (d) Mr. Aleem's confession "directly contradicted his earlier, repeated story" that a rival group of young men shot Mr. McKay;

and (e) the friendship between Mr. Aleem and Mr. Ingram which "weakens the reliability of Mr. Aleem's statement," and their incarceration in jail at the same time "supports the inference that [Mr.] Aleem's statement to [Ms.] Norman represented an act of loyalty rather than an honest confession."

■■■ " 'A statement tending to expose the declarant to criminal liability and offered as tending to exculpate the accused is admissible when the declarant is unavailable *and corroborating* circumstances clearly indicate the trustworthiness of the statement.' " [5] We give deference to the trial court's factual findings; thus, "in reviewing the trial court's ruling on the admissibility of declarations against penal interest, we will not disturb the trial court's [factual] findings unless they are clearly erroneous." [6] But, the determination of whether "a statement is against the declarant's penal interest is clearly a legal question," [7] which we review *de novo*. [8]

■■■ Under our *Laumer* decision, the trial court must " 'undertake a three-step inquiry to ascertain (1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement.' " [9] We "require[ ] a fact-intensive determination of the surrounding circumstances in which the declarations were made." [10] As for the third step, which is at

---

5. *Hammond v. United States*, 880 A.2d 1066, 1099 (D.C.2005) (citing *Laumer, supra,* 409 A.2d at 199) (emphasis in the original).

6. *Laumer, supra,* 409 A.2d at 203 (citation omitted).

7. *Id.*

8. *Doret v. United States*, 765 A.2d 47, 62 (D.C. 2000) (superseded in part by *Crawford v.*

*Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

9. *Doret, supra,* 765 A.2d at 64 (quoting *Laumer, supra,* 409 A.2d at 199).

10. *Doret,* 765 A.2d at 64 (citing *United States v. Hammond,* 681 A.2d 1140, 1146 (D.C. 1996)) (referencing *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). *Williamson* declared

issue in the case before us, we examine (1) "the timing of the declaration"; (2) "to whom the statement was made"; (3) "the existence of corroborating evidence in the case"; and (4) "the extent to which the declaration is really against the declarant's interest."[11] Furthermore, under our analytical framework, we have recognized "the 'significant burden' which the proponent of a declaration against penal interest must meet to justify its admission."[12]

■ As the trial court found and as we agreed in *Ingram I*, the first two prongs of the *Laumer* test are not at issue here. Mr. Aleem made a statement confessing to shooting Mr. McKay and he was unavailable to testify at trial because he had invoked his Fifth Amendment privilege against self-incrimination. The third prong is critical in this case—"whether corroborating circumstances clearly indicate the trustworthiness of the statement." It is important to note at the outset of our inquiry into the third prong, that although we delineated a three-prong test in *Laumer*, we were careful to state "that the corroboration requirement of the rule . . .

involves no fixed criteria. The three factors discussed . . . are not exhaustive and no one factor will be dispositive."[13]

With respect to the timing of a declaration against penal interest, we have recognized that a "'declarant's inculpatory statement which was made some four months after the crime was too attenuated and remote to provide assurance of reliability.'"[14] We have reached the same conclusion with respect to statements made three and nine months after the offense.[15] As we said in *Laumer*, "declarations made shortly after the crime for which an accused is charged are often more reliable than those made after the lapse of time."[16] Here, Mr. Aleem's statement came eight months after the shooting, and hence, the timing casts doubt on its reliability.

Mr. Aleem made the statement to Ms. Norman, defense counsel for Mr. Ingram and a person who was not a close friend or relative.[17] Nevertheless, Mr. Ingram emphasizes "the rapport" established between Mr. Aleem and Ms. Norman. Ms. Norman testified that she thought Mr. Aleem "trusted" her and that he didn't think she

that whether a "confession was truly self-inculpatory . . . can be a fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved," and the Court remanded the case so that the fact-intensive inquiry could be conducted. *Id*. at 604, 114 S.Ct. 2431.

11. *Bell v. United States*, 950 A.2d 56, 64 (D.C. 2008) (citing *Laumer*, 409 A.2d at 200–03).

12. *Burno v. United States*, 953 A.2d 1095, 1104 (D.C.2008) (citing *Laumer*, 409 A.2d at 200).

13. *Laumer, supra*, 409 A.2d at 203.

14. *Gilchrist v. United States*, 954 A.2d 1006, 1015 (D.C.2008) (quoting *Laumer*, 409 A.2d at 200–201) (citing *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir.1976)).

15. *See Bedney v. United States*, 684 A.2d 759, 765 (D.C.1996) (testimony given almost nine months after arrest involved "a lapse of time significantly longer than is generally acceptable") (citing *Irby v. United States*, 585 A.2d 759, 765 (D.C.1991)) ("three months; statement inadmissible"); *Brown v. United States*, 542 A.2d 1231, 1235 (D.C.1988) (third party statement, made to defendant's trial counsel three months after defendant's arrest, excluded); *see also Harris v. United States*, 668 A.2d 839, 843 (D.C.1995) (exclusion of third party statement given to defense investigator nine months after murder was not "clearly erroneous").

16. *Laumer, supra*, 409 A.2d at 200.

17. *See Laumer*, 409 A.2d at 201 ("The existence of a close relationship between the declarant and the witness also may provide indications of trustworthiness.").

"would tell anybody" about his confession. Yet, this testimony, as the trial court discerned on remand, "shows that [Mr. Aleem] did not believe telling something incriminating to Ms. Norman could result in his 'going to jail.'" Moreover, the trial court viewed this testimony in the context of Mr. Aleem's friendship with Mr. Ingram, and stated: "[I]f Mr. Aleem believed that he might be able to help his friend and had nothing to lose by telling Ms. Norman (because he couldn't 'go to jail'), his declaration would seem less trustworthy than a similar declaration by one who fully appreciated the extent to which the statement was really against his penal interest." We see no reason to reject the trial court's conclusion that Mr. Aleem's confession to Ms. Norman provides no guarantee of trustworthiness, despite the "rapport" established between these two persons, because he had a motive to provide a false confession given his friendship with Mr. Ingram and his belief that Ms. Norman would not tell anyone about his confession.[18]

We next examine "the existence of corroborating evidence in this case" supporting Mr. Aleem's confession. Mr. Ingram faults the trial court for saying that "[b]y far the most important factor in this court's analysis is the overwhelming evidence of defendant's guilt and the utter lack of evidence that corroborates [Mr.] Aleem's 'confession.'" He points to Mr. Aleem's motive for shooting Mr. McKay, Mr. Aleem's possession of a gun, Mr. McKay's smoking of marijuana "for several hours before the shooting," the eye contact between Mr. McKay and Mr. Aleem while Mr. McKay was wounded on the ground, and ballistics evidence showing that the second shot entered Mr. McKay from behind.

Our review of the record shows that while there was some evidence that could arguably be viewed as corroborating Mr. Aleem's statement that he shot Mr. McKay, most of that evidence comes from Mr. Aleem, as the trial court emphasized. Under these circumstances, the trial court correctly considered the credibility and the truthfulness of Mr. Aleem in determining whether his statement was really against his interest and could be presented to the jury as a declaration against penal interest.[19] As the trial court put it:

The starting point in the court's analysis is the declarant himself. The record before the court shows Mr. Aleem to be a person with little regard for the truth, even when he is swearing to the truthfulness of his statements or testifying under oath. Based on the evidence submitted at the hearing on remand, we now know also that he has a history of abuse of mind-altering drugs and a severe personality disorder manifesting, among other features, traits of deceitfulness and conning of others for personal gain. We also know from Ms. Norman that he was inordinately eager to help his friend, the defendant, by whatever means necessary, including lying under oath, and we know from Detective Crawford that he displayed extreme hostility toward law enforcement and the government. If Mr. Aleem's statement were to come into evidence through Ms. Norman, without the opportunity to cross-

---

18. See *Laumer,* 409 A.2d at 201 ("The guarantee of trustworthiness stems from the existence of no motive on the part of the declarant to falsify.").

19. See *Laumer, supra,* 409 A.2d at 196, 203, 202 (trial court "must ... weigh[ ] the truth of the statement as well as the credibility of the witness"; "the trial court must assess the credibility of the witness ..."; "the trial court must ascertain the extent to which the statement is against the declarant's penal interest").

examine him, the government might have been able to introduce his prior inconsistent statements or muster some collateral evidence of his general character for untruthfulness, but these would have been an inadequate substitute for full cross-examination of such a thoroughly unreliable witness in front of the jury.

Findings on Remand at 8–9. These findings are supported by the record, and hence, are not clearly erroneous.

In his conversations with Ms. Norman and the defense investigator, and in his appearance before the grand jury, Mr. Aleem gave varying accounts of Mr. McKay's shooting. Thereafter, he told Ms. Norman that Mr. McKay was shot by a rival group consisting of specified persons. He also maintained that Mr. McKay was shot by a rival group but identified different persons who composed the group. When Ms. Norman confronted him with the inconsistency, Mr. Aleem's response was Ms. Norman could "just use the original names." On another occasion, Ms. Norman asked Mr. Aleem if he shot Mr. McKay; Mr. Aleem replied: "If I had shot [Mr. McKay], he wouldn't still be alive. Some fool shot him at point blank range and missed. I would never miss." Mr. Aleem confessed to Ms. Norman after she went to the jail to tell him that she would not call him as a witness at Mr. Ingram's trial. When Ms. Norman inquired whether he would testify about his confession at Mr. Ingram's trial, he responded: "I'll testify if I don't have to go to jail." When he spoke with the defense investigator, Mr. Aleem signed a statement "under penalty of perjury" stating that a group of three men shot Mr. McKay.[20] During his sworn testimony before the grand jury in April 2002, Mr. Aleem denied knowing where Mr. McKay was shot or who shot him or who was with him. He "believed" he saw Mr. Ingram when he heard the shots, but there "was a lot of movement going on, plus [he] was smoking," so he really did not "remember what went down."

Mr. Aleem's reference to "smoking" is confirmed by the September 2002 report of a clinical psychologist at the District's Department of Mental Health, and the report also reveals more than marijuana use. The report indicated that between May 6, 2002 and May 20, 2002, five drug tests performed on Mr. Aleem "were positive for PCP," three showed marijuana use, and one established use of opiates. In addition, the clinical psychologist determined that "Mr. Aleem meets the criteria for Antisocial Personality Disorder." The "symptoms [of that disorder] include . . . deceitfulness, or conning others for personal profit or pleasure; . . . social irresponsibility; and lack of remorse. . . ."

Based upon Mr. Aleem's varying statements about who shot Mr. McKay and what Mr. Aleem saw, and given the report of the clinical psychologist, we see no reason to disturb the trial court's finding that Mr. Aleem is "a person with little regard for the truth, even when he is swearing to the truthfulness of his statements under oath." We acknowledged in *Ingram I* that we owe deference to the trial court's credibility/reliability findings and are bound by them unless they are "clearly erroneous."[21] On this record, those findings are not clearly erroneous.

---

**20.** Ms. Norman was unable to find her files for this case, and Mr. Aleem's statement to the investigator was not presented to the trial court on remand.

**21.** As we said in *Ingram I*: "Relying primarily on the fact that [Mr.] Aleem gave inconsistent accounts of what occurred and 'lied through his teeth,' the [trial] judge was of the opinion that [Mr. Aleem]'s confession was unreliable and should not be presented to the jury unless

Similarly, we decline to reject the trial court's findings concerning the extent to which Mr. Aleem's declaration really was against his penal interest. The trial court asserted:

> When Ms. Norman asked him whether he was willing to testify to his latest version of the truth, [Mr.] Aleem responded, "yes, if I don't have to go to jail." Surely this implies that [Mr.] Aleem believed, for whatever reason, that he would not have to "go to jail" based on what he had already told Ms. Norman. The logical basis for the exception for statements against penal interest is that people would not ordinarily confess their guilt of a crime if it were not true ... Putting aside [Mr.] Aleem's general disregard for the truth demonstrated by this record, the question is not whether Ms. Norman was in fact bound by a confidence not to repeat [Mr.] Aleem's statement to her, but whether [Mr.] Aleem believed that she was. To the extent that [Mr.] Aleem's own conduct in the wake of his "confession" shows that he did not believe telling something incriminating to Ms. Norman would result in his "going to jail," it tends to cut against the trustworthiness

of his statement as a true statement against penal interest.

*Laumer* made clear that "the nonexistence of potential criminal liability poses no deterrent to falsification"; so long as Mr. Aleem was convinced that he would suffer no jail time for his confession, his statement is not "disserving to his interests," and hence, lacks trustworthiness.[22]

Mr. Ingram's intonation of what a reasonable jury might infer from the evidence presented cannot overcome the trial court's findings regarding Mr. Aleem's credibility and the extent to which his statement actually was against his penal interest. Nor, under all of the surrounding circumstances of this case, do Mr. Aleem's statements showing his presence in the alley where Mr. McKay was shot, bystanders' questions to Mr. Aleem as to whether he fired the shots, ballistics evidence demonstrating that the second bullet entered Mr. McKay's body in the buttocks, and Mr. Aleem's statement of his motive for shooting Mr. McKay, provide trustworthy corroboration of his confession. "The requirement of corroborating circumstances warranting admission of statements against penal interest plainly goes beyond minimal corroboration, for the circumstances must 'clearly' indicate the trustworthiness of the statement."[23] On

the prosecution had the opportunity to cross-examine him. The 'clearly erroneous' standard is a deferential one, and we must apply it accordingly." *Id.* at 267. We believe that Mr. Ingram places too much emphasis on our statement in *Ingram I* that "[t]he question is, however, when [Mr.] Aleem lied, was it when he denied that he shot [Mr.] McKay or when he confessed that he committed the crime?" *Id.* at 267. That statement was not a command that the trial court determine beyond a reasonable doubt whether, in fact, Mr. Aleem shot Mr. McKay or whether he lied when he said he did not shoot Mr. McKay.

**22.** *Laumer, supra,* 409 A.2d at 202, 203. *See also State v. Woodman,* 125 N.H. 381, 480 A.2d 169, 171 (1984) (The "inclusion of an

objective test" in Rule 804(b)(3) of the Federal Rules of Evidence "does not preclude courts from making an inquiry into the declarant's subjective state of mind." " 'If the declarant does not believe the statement to be against his interest, the rationale for the exception fails.' ") (quoting 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE, 804–98 (1981) (other citation omitted)).

**23.** *Ingram I, supra,* 885 A.2d at 266; *see also United States v. Rodriguez,* 706 F.2d 31, 40 (2d Cir.1983) ("The corroboration requirement ... should be construed to effectuate its purpose of 'circumventing fabrication.' ") (where corroboration came from a defendant's own statements, "more reliable corroboration is required.").

this record there was only minimal corroboration that Mr. Aleem shot Mr. McKay. In sum, we are satisfied that the trial court properly excluded the confession of Mr. Aleem as not falling in the category of a trustworthy declaration against penal interest.[24]

### The Brady and Winfield Issues

■ Mr. Ingram argues that "[c]oupled with [Mr. Aleem's] admission that he possessed a gun near the crime scene [on the] night [of the shooting], [Mr.] Aleem's grand jury testimony was exculpatory because it provided a sufficient basis to mount a third-party defense." He also asserts that "[b]y withholding [Mr.] Montgomery's grand jury testimony and statements to investigators the government deprived Mr. Ingram of the ability to use the statements to impeach [Mr.] McKay's testimony." The government contends that Mr. Ingram "fails to show any Brady[25] violation"; and that "[t]here is no reasonable probability that [Mr.] Aleem's testimony, if disclosed, would have changed the outcome of the trial."

■ "Brady established that the government has a constitutional duty to disclose material evidence favorable to a criminal defendant in time for the defendant to make effective use of it at trial."[26] The duty to disclose also applies "to evidence that could be used to impeach the credibility of a government witness."[27] To obtain a reversal of his conviction on Brady grounds, the defendant bears the burden of establishing "a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different."[28] "A 'reasonable probability' of a different result exists when the undisclosed evidence 'undermines confidence in the outcome of the trial' "; and it is insufficient to show "a 'mere possibility' that the undisclosed evidence might have aided the defense or changed the trial's outcome...."[29] To mount a third-party culpability defense, a defendant must present

> [P]roof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense. The focus of the standard is not on the third party's guilt or innocence, but on the effect the evidence has upon the defendant's culpability, and in this regard it need only tend to create a reasonable doubt that the defendant committed the offense.[30]

---

24. Based on the exclusion of Mr. Aleem's confession, Mr. Ingram presents a Fifth and Sixth Amendment constitutional deprivation of the right to present a defense contention on appeal. However, he did not preserve this claim in the trial court. Therefore, we review it only for plain error. Mr. Ingram cannot meet this rigorous standard. In the final analysis, even assuming error that was plain and that affected substantial rights, Mr. Ingram cannot demonstrate that there was a reasonable probability that any error had a prejudicial effect on the outcome of his trial or resulted in a miscarriage of justice. See Thomas v. United States, 914 A.2d 1, 21, 23 (D.C.2006); see also United States v. Olano, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

25. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

26. Stewart v. United States, 881 A.2d 1100, 1116 (D.C.2005) (internal quotations and citations omitted).

27. Id. (citation omitted).

28. Id.(quoting Farley v. United States, 767 A.2d 225, 228 (D.C.2001)).

29. Id. at 1116–17 (quoting Ginyard v. United States, 816 A.2d 21, 32 (D.C.2003)).

30. Bruce v. United States, 820 A.2d 540, 543 (D.C.2003) (quoting Winfield v. United States, 676 A.2d 1, 4 (D.C.1996)) (en banc) (internal quotations and other citations omitted).

Neither Mr. Aleem's grand jury testimony, nor that of Mr. Montgomery was exculpatory as to Mr. Ingram, or material to his guilt or punishment. Mr. Aleem informed the grand jury that he did not shoot Mr. McKay and he did not know who shot Mr. McKay. He went to his car after the shooting to get his gun but he did not retrieve it. While Mr. Montgomery was in the alley at the time of the shooting and claimed that he saw Mr. Ingram and "Snags" (presumably Mr. Aleem), he stated that Mr. Ingram was "a good 80 feet from [him]" and "Snags" also was behind him. The shot he heard came from the middle of the alley which was dark. He saw the victim fall but could not see that it was Mr. McKay. As he put it, "I wasn't that close to actually see that."

Not only was the grand jury testimony of Mr. Aleem and Mr. Montgomery not exculpatory or material to guilt or punishment with respect to Mr. Ingram, but Mr. Aleem's testimony also would not have been sufficient to allow Mr. Ingram to present a *Winfield* defense. The presence of unidentified people in the alley who asked whether Mr. Aleem was "shooting at them," and Mr. Aleem's statement that he went to his car with the intent to get his gun after Mr. McKay was shot do not "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." [31] Moreover, as the trial court determined, even though "some of Mr. Montgomery's grand jury testimony arguably was inconsistent with portions of [Mr.] McKay's trial testimony, and [Mr.] Montgomery could have been used to impeach [Mr.] McKay on

certain details of his testimony, ... the government did not violate *Brady* by not turning over the grand jury testimony of this witness, who was known to the defense and whom the government intended to present at trial if he could be found." Furthermore, "[t]he discrepancies between the grand jury testimony of [Mr.] Montgomery and the trial testimony of [Mr.] McKay were relatively minor, and those discrepancies would have also impeached, in a much more powerful way, the trial testimony of the defendant himself." [32] In sum, we are satisfied that there is no "reasonable probability that if the evidence had been disclosed [prior to trial], the result of the proceeding would have been different." [33]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

**31.** *Bruce, supra,* 820 A.2d at 543.

**32.** Findings on Remand, at 17 note 4.

**33.** *Stewart, supra,* 881 A.2d at 1116. Mr. Ingram's reliance on *Sykes v. United States,* 897 A.2d 769 (D.C.2006) is unavailing. *Sykes* is remarkably different from this case. The un-

disclosed testimony from two potential witnesses would have completely called into question the credibility of a government informant and key government witness. Hence, the undisclosed evidence undermined confidence in the outcome of the trial.